UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

    Plaintiff,

      v.                           Case No. 2:18-cr-00614-JS-ARL

CHRISTIAN ROMANDETTI, SR.,

    Defendant.

_____/

## DEFENDANT'S SENTENCING MEMORANDUM

The Defendant, Christian Romandetti, Sr., respectfully submits this sentencing memorandum for this Honorable Court's consideration. Mr. Romandetti requests this Court determine that a variance from the applicable guideline range is appropriate under 18 U.S.C. § 3553. Rather than imprisonment, Mr. Romandetti requests a sentence of one-day time-served to be followed by a term of supervised release with a special condition of home detention.

## STATEMENT OF FACTS

### *Procedural History*

On May 24, 2022, Mr. Romandetti pled guilty, pursuant to a plea agreement, to one count of conspiracy to commit securities fraud in violation of 18 U.S.C. § 371. *See* Doc. 118.  Mr. Romandetti's sentencing hearing is set for January 12, 2023.

### *Advisory Guideline Calculation*

Because a § 371 violation carries a five-year statutory maximum, Mr. Romandetti faces a

guideline sentence of 60 months.[1] *See* PSR at ¶ 88 (citing USSG § 5G1.1(a)). As the following

discussion demonstrates, this guideline range violates the principle of just sentencing set forth in

18 U.S.C. § 3553.

**MEMORANDUM OF LAW**

This memorandum establishes that a variance is warranted in Mr. Romandetti's case

pursuant to 18 U.S.C. § 3553, notwithstanding the advisory guideline sentence. The application of

this statute's framework is especially critical since each of its sentencing factors supports Mr.

Romandetti's request for a variance. *See* 18 U.S.C. § 3553(a).

I.  ***Booker and its Progeny Provides the Court with the Discretion to Impose a Variance under 18 U.S.C. § 3553(a)***

A sentencing court is unencumbered in its ability "to consider every convicted person as

an individual and every case as a unique study in the human failings that sometimes mitigate,

sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38,

53 (2007) (quoting *Koon v. United States,* 518 U.S. 81 (1996)). To conduct an individualized

assessment, the Sentencing Reform Act provides that "[n]o limitation shall be placed on the

information concerning the background, character, and conduct of a person convicted of an offense

which a court of the United States may receive and consider for the purpose of imposing an

appropriate sentence." 18 U.S.C. § 3661. This right is fundamental to our sentencing process and

has been recently affirmed by the United States Supreme Court. *See Concepcion*, 142 S.Ct. 2389,

2398-99 (2022)("There is a "long" and "durable" tradition that sentencing judges "enjo[y]

discretion in the sort of information they may consider at an initial sentencing proceeding").

As contemplated by the Supreme Court, this Court's ability to consider all relevant

---

[1] There are no objections to this guideline calculation.

information at the time of Mr. Romandetti's sentencing is critical to its ability to fashion a just sentence in his case. *See Pepper v. United States*, 562 U.S. 476, 488 (2011) ("Permitting sentencing courts to consider the widest possible breadth of information about a defendant ensures that the punishment will suit not merely the offense but the individual defendant").

Consistent with this principle, § 3553(a) requires sentencing courts to consider not only the advisory Guidelines range, but also the facts of a specific case through the lens of seven factors. *See* 18 U.S.C. § 3553(a)(1)-(7). Against the backdrop of these factors, Mr. Romandetti respectfully submits that a variance is warranted in his case.

1.     **The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant**

The significance of the first § 3553 factor is based on its comprehension that a consideration of a defendant's criminal conduct cannot disregard the life he has led beyond his crime. See *United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006)(Rakoff, J.)("But, surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance").

*The History and Characteristics of the Defendant*

The tenet that a defendant's criminal conduct must be measured against his overall life has resonance in the instant case. For the weighing of the good with the bad in Mr. Romandetti's life reveals that his criminal conduct should not provide the sole basis for judging his fate. Rather, Mr. Romandetti's history and characteristics show that his life has been marked by his dedication to his family and his great compassion for others. *See generally Letters of Support*, attached hereto as composite Exhibit 1. The following discusses each of these principles in turn.

### *Dedication to Family*

Mr. Romandetti is not only a dedicated husband, but also is a committed and loving father to his three children. *See* Ex. 1, *Letter of Charles Roberts* (retired Florida state court judge) stating that Mr. Romandetti is a family man who has a close relationship with his wife and children); *Letter of Attorney Tino Gonzalez* ("Mr. Romandetti is an exceptional role model to his children"). The best description of Mr. Romandetti's exemplary parenting is found in the words of his daughter Karina Romandetti, who writes of the many ways her father has shown his love and support to her over the years. *See id.*, *Letter of Karina Romandetti.*[2]

Consistent with Mr. Romandetti's love and support for his children, he shows similar care to the members of his extended family. *See id.*, *Letter of Janet Ann Trusler.* Ms. Trusler writes of the extraordinary kindness and support Mr. Romandetti has shown her throughout her life.

> My brother provided complete financial and emotional support to me through my late husbands terminal illness. He was working more than 12 hours a day .. and still found time for a daily phone call to check in on us. He traveled to Germany for my husbands medical treatments on two occasions to be sure our accommodations were perfect and my husbands medical care was being handled properly. He welcomed me into his home for several months when I endured a house fire. He never expected anything from me in return. He felt blessed to be able to help me get through. He has always been my forever rock and support team.

*See id.*

### *Compassion*

Mr. Romandetti's great love for his family parallels his commitment to others. *See* Ex. 1, *Trusler Letter* ("I respect my brother for his passionate heart, his extreme generosity and how he

---

[2] In determining Mr. Romandetti's sentence, this Court may consider that he is an excellent father to his children. *See e.g., United States v. Pauley*, 511 F.3d 468 (4th Cir. 2007) (affirming 42-month sentence for defendant convicted of possession of child pornography with an advisory guideline range of 78-97 months in part because "besides the criminal conduct at issue, Pauley was a . . . good father").

cares for deeply for anyone in need"). Perhaps, the best description of this contention is found in the letter of his former employee, Julie Hardesty.  Ms. Hardesty writes:

> In 2004 when three Hurricanes crushed central Florida, Chris found that he was the only gas station in town (due to it being a marina) that was able to fuel all of the Melbourne emergency support services because of the type of gas pumps that we had. We had every fire engine, police car and ambulance lined up to get fuel using signatures only to keep them going during this disaster. That went on for days until power was restored to Melbourne.
>
> Additionally, he supported the Indialantic police department by donating the painting services for their police cars. He also supported many of the local schools and sports programs each and every year, he really has a heart for the kids. He set up a location at the Marina Towers for Christmas food and toy drives for our entire community.
>
> I also saw his compassion and care when any of my co-workers were going through some rough times. He would quietly reach out to them and assist. That is why I felt compelled to let you know that I support him and hope that you consider these experiences when you determine his sentence.

Ex. 1. *Letter of Julie Harsdesty. See also id*., *Letter of Mark LaRusso, Vice Mayor of Melbourne* (same); *Letter of Attorney Patrick Bickford* (same); *Letter of Micah Rose* ("Growing up with Mr. Romandetti I witnessed his constant volunteering to help friends and family especially in times of need . . . [he] has consistently shown characteristics of compassion commitment, and selflessness throughout the thirty (30) years I have known him").  In support of these statements, Mr. Rose describes how Mr. Romandetti once drove his RV to Washington D.C. to transport Mr. Rose's sister to her family in Florida after emergency surgery.[3]  *See id*, *Rose Letter*.

---

[3] On so many occasions, Mr. Romandetti has performed acts of kindness towards others. Such gestures reveal much about his character.  As the poet and abolitionist James Russell Lowell stated, "[e]very man feels instinctively that all the beautiful sentiments in the world weigh less than a single lovely action." James Russell Lowell, *Among My Books*, 358 (1898).

Consistent with Mr. Rose's description, Sandra Zabel, an immigrant from Germany, states that Mr. Romandetti opened his home to her, thus rescuing her from deplorable living conditions in the United States. *See id; Letter of Sandra Zabel. See also id.*, *Letter of Francisco Bizzarro* (describing Mr. Romandetti's support during hurricanes, the death of family members, and the COVID pandemic); *Letter of Leslie Wiedenhoeft* ("[M]y husband and I know Mr. Romandetti to be a charitable, witty, sincere, and giving man").

The letters of support consistently depict Mr. Romandetti's life as one of commitment and kindness to others. In the end, Mr. Romandetti's social commitment stems from his sense of empathy toward people in need. *See id, Letter of Corey Kaplan* ("He has been that guy that helps people . . .he has always been very generous and wears his heart on his sleeve"). *Letter of Adam Fischer* ("One of the most valuable lessons I learned from Mr. Romandetti is the importance of philanthropy and giving back to the community"). *Letter of Novalia Wright* (stating that Mr. Romadetti's kindness and caring to her and his other employees made him the best boss); *Letter of Shelly Keebler* (same); *Letter of Kristen Romandetti* (stating that "from community service to cancer patient advocacy, to his dedication to his family and friends" . . . her husband "puts other's needs before his own").

Returning to *Adelson*, Mr. Romandetti shows the great wisdom and insight of Judge Rakoff. To be sure, measuring Mr. Romandetti solely by his criminal acts cast against a rigid matrix ignores his most redeeming characteristics. In addition to *Adelson*, other cases support the proposition that a defendant's history of charitable deeds and good works supports a variance. *See*, *e.g.*, *United States v. Tomko***, 562 F.3d 558, 569-71 (3d Cir. 2009) (en banc) (where defendant was convicted of tax evasion of $225,000 and faced a guidelines sentence of 12-18 months, district court's sentence to probation on condition of one year home detention was not unreasonable

because of his "negligible criminal history, his employment record, his community ties, and his extensive charitable works"); *United States v. Thurston,* 544 F.3d 22, 26 (1st Cir. 2008) (where defendant was convicted of fraud in excess of five million dollars and guidelines capped at 60 months, district court's sentence of 3-months was affirmed based on defendant's "charitable work, community service, generosity with time, and spiritual support and assistance to others"); *see also United States v. Cooper*, 394 F.3d 172 (3rd Cir. 2005) (similar).

In the end, Mr. Romandetti's actions establish his commitment to his family and his compassion for others. Thus, if *Adelson's* admonition that a court should consider a defendant's overall existence in imposing his sentence, then Mr. Romandetti's history and characteristics calls for a variance from the applicable guideline range.

### The Nature and Circumstances of the Offense

Having considered Mr. Romandetti's history and characteristics, the essential question is how a man, who shows such redeeming characteristics, could have committed his crime. An analysis of the circumstances surrounding Mr. Romandetti's offense provides certain enlightenment.

The gravamen of Mr. Romandetti's offense is that he falsely inflated the stock price of his company First Choice HealthCare (First Choice) which financially benefited from the sales of the inflated shares. While such a description is accurate, it is ultimately incomplete. Although Mr. Romandetti's actions were certainly wrong and illegal, his actions were not motivated by a desire to enrich himself at the expense of others. Rather, he invested a significant amount of his family money (approximately $7,000,000 from the sale of a family building) in a business that he believed would improve the delivery of healthcare services in Florida. In the process, he built a company that developed an excellent reputation for outstanding clinical care. *See, e.g.,* Ex. 1, *Letter of*

*Attorney Samuel Cacciatore* (stating that First Choice was the best run medical clinic). Nevertheless, First Choice struggled financially in its initial years due to a business model which depended on a significant patient load in order for the company to make revenues. That is, First Choice only earned a small percentage of the total billing, which instead was primarily used to pay for the costs of the physicians and overhead. Because First Choice had a limited patient base in its early years, it lost money. As a result, Mr. Romandetti used the sale proceeds of the inflated stocks to pay himself and the other employees.

While the foregoing description does not excuse his actions, it does introduce a mitigating aspect of Mr. Romandetti's criminal conduct. Although misguided, Mr. Romandetti believed that First Choice would ultimately succeed as its client base and associated revenues grew, which it did every year. Thus, he justified his actions with his belief, if not conviction, that the shareholders would receive value for shares.

Courts have recognized a critical distinction between two types of fraud defendants. The first category involves fraud defendants who attempt to reap financial benefits without providing anything in return. *See United States v. Schneider*, 930 F.2d 555, 558 (7th Cir. 1991). The second category involves fraud defendants, who always intended to provide value despite their illegal actions. *See id.*

Regarding this second category of defendants, it is apparent that they should not be treated the same as a defendant who never intends to perform or repay the benefits she has received. *See United States v. Sublett*, 124 F. 3d 693, 694-95 (5th Cir. 1997)(stating that because the defendant's conduct falls within the second category of fraud defendants, "he should not be characterized as causing as much loss as one who intends to totally cheat the victim, giving nothing in return."); *Schneider*, 930 F.2d at 558-59 (finding that the government's loss argument was irrational, since

"it would mean that the [defendants] would (other things being equal) be punished as severely as a con artist who intended to winkle [a contract's total value] from a senile old lady."). While admittedly the foregoing cases are factually distinguishable from the instant case, the distinction drawn between fraud defendants in *Sublett* and *Schneider* provides an important criterion in Mr. Romandetti's case. Although he committed fraud, Mr. Romandetti did not intend to cause harm to the shareholders of his company – though it was a potential result of his criminal actions.

Mr. Romandetti's motive for coming his offense is a relevant sentencing consideration since it directly impacts his culpability. That is, the degree of a defendant's culpability "is generally assessed according to two kinds of elements: the nature and seriousness of the harm caused or threatened by the crime; and the offender's degree of culpability in committing the crime, in particular, his degree of intent (mens rea), motives, role in the offense, and mental illness or diminished capacity." Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?*, 89 Minn. L. Rev. 571, 590 (Feb. 2005).

While Mr. Romandetti is certainly liable for his criminal actions, his lesser culpability calls for a lesser sentence. Supreme Court precedent and the guidelines themselves recognize the validity of this argument. *See, e.g., Atkins v. Virginia*, 536 U.S. 304, 305 (2002)("As to retribution, the severity of the appropriate punishment necessarily depends on the offender's culpability"); USSG § 2G2.2 (reducing offense level by two-levels where the defendant does not intend to traffic in, or distribute child pornography); USSG § 2L1.1(b)(1)(for passport offenses, if "the offense was committed other than for profit" decrease the offense level by three levels); USSG §§ 2D1.1 and 5C12 (reducing guideline level and eliminating minimum mandatory based on safety valve which applies to less culpable and less dangerous offenders).

Finally, Mr. Romandetti's recognition of and remorse for his misconduct is demonstrated

in three ways. Mr. Romandetti accepted responsibility in this case and agreed to resolve his case prior to trial. Second, the letters of support establish Mr. Romandetti's deep remorse. *See* Ex. 1, *Letters of Detective Jeffrey Janes (retired) and* Charles Roberts.

Because Mr. Romandetti recognizes that his actions were serious and caused harm to his shareholders, he attempted to mitigate his harm by cooperating with the Government concerning his own actions and the crime of others. Despite his cooperation, Mr. Romandetti does not qualify for a substantial assistance reduction under USSG § 5K1.1 reduction, like his co-conspirator Anthony Vassallo, who received a sentence of 4-years of imprisonment despite a significantly greater loss amount. *See United States v. Vassallo*, Case No. 17-cr-372 (E.D.N.Y 2022)(imposing restitution amount of $4,436,135,.06).

Mr. Romandetti's inability to qualify for a substantial assistance reduction is not based on his lack of effort but rather on his lesser culpability than his co-defendants. Such lesser culpability means that he has less to offer the Government. *See* Maria Limbert, *Problems Associated with Prosecutorial Control Over Filing Substantial Assistance Motions and a Proposal for a Substantial Assistance Pro-Sentence Hearing*, 27 J. LEGIS. 251, 258-59 (2001)(illustrating how low-level offenders rarely possess type of information that constitutes substantial assistance). As one district court has explained:

> [w]hile usefulness of the assistance is an important factor, it is not necessarily the most significant one. Indeed, one consequence of over-weighing this factor is the "cooperation paradox," whereby more culpable defendants receive shorter sentences than less culpable defendants.

*In re Belvett*, No: 6:04-cr-199, 2005 WL852649, at *1, *2 (M.D. Fla. March 17, 2005); *see also* Jane L. Froyd, *Safety Valve Failure: Low-Level Drug Offenders and the Federal Sentencing Guidelines*, 94 Nw. U.L. REV. 1471, 1493-94 (2000).

Notwithstanding Mr. Romandetti's failure to qualify for a § 5K1.1 reduction, this Court should consider his efforts to mitigate his harm by providing cooperation to the government in support of a variance under § 3553(a). *See United States v. Blue,* 557 F.3d 682, 686 (6th Cir. 2009)("the government's failure to file a Section 5K1.1 departure does not necessarily preclude a sentencing court from taking into account substantial assistance when considering the appropriate sentence in light of the Section 3553(a) factors."); *United States v. Doe,* 213 Fed.Appx. 660, 663 (10th Cir. Jan. 12, 2007)(unpub); *United States v. Ochoa-Ramos,* 2008 WL 2062341, at *3 (E.D.Wis. 2008).

**2.      The Need for the Sentence Imposed**

*A.      To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense*

As a threshold matter, Mr. Romandetti's request for a probationary sentence is a request for significant punishment. *See Gall,* 552 U.S. at 38 (a sentence of probation is "a substantial restriction of freedom."); *Jones v. Cunningham,* 371 U.S. 236, 242 ("[T]he custody and control of the Parole Board involves significant restraints on petitioner's liberty because of his conviction and sentence, which are in addition to those imposed by the State upon the public generally… what matters is that they significantly restrain petitioner's liberty to do those things which in this country free men are entitled to do.").

Moreover, in imposing a just sentence, this Court should also consider the significant punishment resulting from the collateral consequences of Mr. Romandetti's felony conviction. Prior to the instant offense, Mr. Romandetti had no felony record. Nevertheless, based on his felony conviction, Mr. Romandetti will face an overwhelming number of collateral consequences. A recent congressional report authored by the United States Government Accountability Office

(GAO) demonstrates that there are 641 collateral consequences of a nonviolent felony conviction. *See* GAO Report 17-691, NONVIOLENT DRUG CONVICTIONS, *Stakeholders Views on Potential, Actions to Address Collateral Consequences*, (Sept. 2017), summary excerpt attached hereto as Exhibit 2. Of these 641 collateral consequences, 497 (78%) of them may last a lifetime. *See id*.

Recognizing the effect of collateral consequences of a felony conviction, one district court has emphasized the need for federal judges to account for such an impact at sentencing *United States v. Nesbeth*, Case No. 1:15-cr-00018, 2016 WL 3022073, at *1 (E.D.N.Y May 24, 2016)(Block, J.)(varying downward from guideline range of 33 to 44 months imprisonment to one-year of probation for a drug defendant based in part on the number of statutory and regulatory consequences he faced as a convicted felon). As *Nesbeth* establishes, the civil death that Mr. Romandetti faces due to his conviction constitutes significant punishment. *See also* Wayne A. Logan, *Informal Collateral Consequences,* 88 Washington Law Review 1103 (2013)("Today, convict status serves as a perpetual badge of infamy, even serving to impugn reputation beyond the grave").

Finally, as previously noted, Mr. Romandetti is haunted by remorse due to the instant case. While his miserable state results from his own actions, a consideration of Mr. Romandetti's condition is also important in terms of the punishment he has received for his crime. *See United States v. Prosperi*, 686 F.3d 32, 47-48 (1st Cir. 2012)(citing the district court's observation that "sometimes [courts do not] fully recognize the anguish and the penalty and the burden that persons face when called to account, as these men are, for the wrong that they committed").

B.      *To afford adequate deterrence to criminal conduct*

The preceding established the proposition that a lengthy prison sentence is not necessary

to accomplish the goal of just sentencing. In turn, this section addresses the question of whether a long prison sentence will accomplish the § 3553 factor of deterrence. Such an examination requires an analysis of both general and specific deterrence.

### 1. General Deterrence

The principle of general deterrence is based on the premise that lengthy prison sentences deter crime. Not surprisingly then, prosecutors consistently argue the factor of general deterrence in support of guideline sentences. And why not? If you consistently assert that prison sentences are not only necessary to punish the Defendant but also needed to prevent crimes, then you gain strong support for guideline sentences that nearly always require imprisonment. The troubling aspect of this is that it is wrong and has led to mass incarceration. *See* Dr. Oliver Roeder et al., *What Caused the Crime Decline*?, Brennan Center for Just., 22-23 (Feb. 12, 2015).

The condition of mass incarceration is especially troubling since there is no correlation between punishment and reductions in crime. *See id; see also* Gary Kleck and J.C. Barnes, *Deterrence and Macro-Level Perceptions of Punishment Risks: Is There a "Collective Wisdom"*?, 59 Crime & Delinquency 1006, 1031-33 (2013). Kleck and Barnes' study concludes that "increases in punishment levels do not routinely reduce crime through general deterrence mechanisms, because the fundamental link between punishment levels and perceptions of punishment levels appears to be weak to nonexistent." *Id*. at 1031.

Perhaps, what is even more troubling about a federal prosecutors' embrace of general deterrence is that such a posture contradicts their employer's perspective on the matter. Indeed, the United States Department of Justice agrees with the conclusion that incarcerating defendants is not an effective means of deterrence. *See* U.S. Dept. of Justice, Nat'l Inst. of Justice, *Five Things*

*About Deterrence* (July 2014), attached hereto as Exhibit 3. In fact, the Department of Justice finds that even increasing the severity of punishment does little to deter punishment. *See id*.; *see also* Hannah Arendt, *Eichmann in Jerusalem*, Epilogue (1963)("No punishment has ever possessed enough power of deterrence to prevent the commission of crimes").

      2.      *Specific Deterrence*

Having established that prison sentences, regardless of length, has no impact on general deterrence, this section demonstrates that the factor of specific deterrence also supports Mr. Romandetti's request for a variance. The first part of this section focuses on studies establishing that incarceration has no effect on recidivism. The second part asserts that Mr. Romandetti's history and characteristics prove that he will never commit another crime.

      a.      *The relationship between incarceration and recidivism*

As in the case of general deterrence, the empirical evidence does not establish a relationship between sentence length and specific deterrence, regardless of the type of crime. *See* National Institute of Corrections*, Myths and Facts, Why Incarceration is Not the Best Way to Keep Communities Safe* (2016), attached hereto as Exhibit 4. To be sure, the best available evidence establishes that imprisonment does not reduce recidivism more than noncustodial sanctions. Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011). There is strong evidence that prison - by disrupting education and employment, reducing prospects for future employment, weakening family ties and exposing less serious offenders to older more serious offenders - leads to increased recidivism. *See Criminogenic Effects of Imprisonment: Evidence from State Panel Data 1974-2002,* 6 Criminology & Public Policy 589 (2007). *see also* Friedrich Nietzsche, *The Genealogy of Morals*, essay 2, aph. 14 (1887) ("All in all, punishment hardens and renders people more insensible; it

concentrates; it increases the feeling of estrangement; it strengthens the power of resistance").

Thus, the most effective to promote public safety and ensure that convicted persons can lead law-abiding lives is through broad use of non-incarceration sentences, especially since "incarceration does little to change a person's behavior" and persons sentenced to prison have higher recidivism rates than those sentenced to community corrections. Ex. 3 at 1, 4.

  b.  *Mr. Romandetti's lower risk of recidivism*

 The likelihood that the defendant "will engage in future criminal conduct [is] a central factor that district courts must assess when imposing sentence." *Pepper,* 562 U.S. at 492.

Mr. Romandetti is 62 years old and has no criminal history. Moreover, he is married, has been employed throughout his life, and does not have a substance abuse problem. Because of his marital status, employment history, and lack of substance abuse, Mr. Romandetti poses a lower risk of recidivism. *See* U.S. Sent. Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 12-13 (May 2004).

In imposing the least sentence sufficient to account for the need to protect the public from further crimes of Mr. Romandetti, this Court should consider the statistically low risk of recidivism presented by him. *United States v. Urbina*, slip op., 2009 WL 565485, *2-3 (E.D. Wis. Mar. 5, 2009) (considering low risk of recidivism indicated by defendant's lack of criminal record, positive work history, and strong family ties). The fact that Mr. Romandetti is in a Criminal History Category of I at the age of 62 further supports his request for a variance. *See, e.g.,* 28 U.S.C. § 994(j) (Congress stressed "the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense.").

  D.  *To provide the defendant with needed educational or vocational training, medical*

*care, or other correctional treatment in the most effective manner.*

Based on his education and employment history, Mr. Romandetti would not benefit from any educational, vocational or treatment programs in the Federal Bureau of Prisons (BOP).

**3.      The Kinds of Sentences Available**

A mandatory minimum sentence does not apply in Mr. Romandetti's case.   Thus, a sentence below the advisory guideline range is permissible.

**4.      The Kinds of Sentences and the Guideline Sentencing Range Established**

A critical question in Mr. Romandetti's case is the exact weight this Court should give to the guidelines. As recognized in *Gall*, district courts "may not presume that the Guidelines range is reasonable." 552 U.S. at 49. Thus, mitigating circumstances and substantive policy arguments that were formerly irrelevant in all, but the most unusual cases, are now potentially relevant in every case.

The guidelines pose a particular risk in Mr. Romandetti' case for a more elemental reason – they falsely provide a promise of predictability and fairness. Regarding the false promise of the guidelines, one district court aptly noted:

> Criminal behavior can fuel public outcry and drive broad legislative and executive agendas to get "tough on crime." But how does that translate to specific instances? If you take a matrix to factor offense severity, overlay it with mandates born of popular outrage, and tailor it purportedly to address almost every eventuality, you get "justice" dictated in advance, marked by visceral condemnation, and based on the pretense of omniscience.

*United States v. Williams*, 372 F.Supp.2d 1335, 1337-1338 (M.D. Fla. 2005)(Presnell, J.).[4]

---

[4]  Although *Williams* was reversed by the Eleventh Circuit in *United States v. Williams*, 456 F.3d 1353 (11th Cir. 2006), the Eleventh Circuit's decision was overruled by the United States Supreme Court. *See Kimbrough v. United States*, 552 U.S. 1353 (2007).

Because we believe the guidelines to be the product of great deliberation and reasoned judgment, we often assume that they provide clear direction for the proper sentencing of every criminal defendant, notwithstanding their backgrounds and the unique circumstances of their case.[5] Thus, we depend on the guidelines to relieve us of the burden and uncertainty of having to decide a just sentence for the any defendant.[6] This reliance is misplaced. The guideline ranges have often and dramatically failed our system of justice in creating results that are fundamentally unjust. For instance, for years, the guidelines for crack cocaine created a situation where defendants were harshly and unfairly sentenced.

Such is the case with the fraud guidelines since they are not the product of careful study based on empirical evidence. Consequently, the fraud guidelines do not reflect an approximation of sentences that might achieve § 3553 objectives.

In *Rita v. United States*, 551 U.S. 338 (2007), the Supreme Court gave two reasons that it may be "fair to assume" that the guidelines "reflect a rough approximation" of sentences that might achieve § 3553(a)'s objectives. First, the original Sentencing Commission used an "empirical approach," which began "with an empirical examination of 10,000 presentence reports setting forth what judges had done in the past." *Id.* Second, the Commission can review and revise the guidelines based on judicial feedback through sentencing decisions, and consultation with other

---

[5] Of course, the guidelines do address the background of each defendant and the circumstances of each case in a limited fashion through criminal history and offense conduct.

[6] At its core, the rigid matrix of the sentencing guidelines demonstrates the deeply-rooted human aversion to uncertainty and ambiguity. *See*, *e.g*, Maria Konnikova, *Why We Need Answers*, The New Yorker (Apr. 30, 2013). As Konnika asserts, studies demonstrate that the need to respond to uncertainty or a lack of clarity is present in the early stages of human development. *Id*. Because of our distress with the unknown and uncertain, we seek to achieve "cognitive closure" defined as the "desire for a firm answer to a question and an aversion to ambiguity." *Id*. (citing Dr. Arie Kruglanski, *Motivated Closing of the Mind*, Psych. Rev., at 263-83 (Apr. 1996)).

frontline actors, civil liberties groups, and experts. *Id*. at 348-50. The Court recognized, however, that not all guidelines were developed in this manner. *See Gall,* 552 U.S. at 46 & n.2; *Kimbrough v. United States*, 552 U.S. 85, 96 (2007).

When a guideline "do[es] not exemplify the Commission's exercise of its characteristic institutional role," because the Commission "did not take account of 'empirical data and national experience,'" the sentencing court is free to conclude that the guideline "yields a sentence 'greater than necessary to achieve § 3553(a)'s purposes, even in a mine-run case." *Kimbrough*, 552 U.S. at 109-10.

### *An Advisory Sentencing Range Pursuant to Section 2B.1 Is Not Based on Empirical Data or National Experience*

Mr. Romandetti's sentence for fraud should not be determined by a mechanistic application of USSG § 2B1.1. Because the Commission failed to rely on empirical data or national experience in promulgating or amending § 2B1.1, it failed to fulfill its institutional role. Thus, this Court is free to disagree, on reasoned policy grounds, with its recommendation. *Kimbrough*, 552 U.S. 101-02, 109-10; *Rita*, 551 U.S. at 351, 357.

When the Commission adopted the original guidelines in 1987, it "decided to abandon the touchstone of prior past practice" with respect to white collar offenses. Justice Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1, 22-23 (1988). Accordingly, the Commission promulgated a fraud guideline that required no more than 30-37 months for defendants in Criminal History Category I. *See* USSG § 2F1.1 (1987). Such a range was based on the Commission's conclusion that fraud offenses required short but definite sentences to have a deterrent effect. The Commission explained that "the definite prospect of prison, though the term is short, will act as a significant deterrent to many of these

crimes, particularly when compared with the status quo where probation, not prison, is the norm."
USSG, ch. 1, intro., pt. 4(d) (1987).

The Commission quickly abandoned its original goal of ensuring "short but definite" sentences. Beginning just two years after the Guidelines went into effect, prison sentences for fraud offenders were steadily increased. The effect of those increases on this case was to add four levels for loss in 1989, to add five more levels for loss in 2001, and to increase the base offense level by one level in 2003. Consequently, Mr. Romandetti's advisory guideline range is now significantly higher than under the original 1987 guideline.

### *The Advisory Sentencing Range is Inconsistent with § 3553(a).*

The Commission's deterrence rationale for dramatically increasing the guideline range was without justification. As noted previously, the empirical research regarding white collar offenders shows no difference between the deterrent effect of probation and that of imprisonment. *See* Weisburd, *supra*; Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 448-49 (2007). ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders.").

Because of these essential problems with § 2B1.1, sentences in fraud cases reflect significant judicial disagreement with the guidelines. Indeed, "since *Booker*, virtually every judge faced with a top-level corporate fraud defendant in a very large fraud has concluded that sentences called for by the Guidelines were too high. This near unanimity suggests that the judiciary sees a consistent disjunction between the sentences prescribed by the Guidelines for cases like these and the fundamental requirement of Section 3553(a) that judges imposes sentences 'sufficient, but not greater than necessary' to comply with its objectives." Frank O. Bowman III, *Sentencing High-*

*Loss Corporate Insider Frauds After Booker*, 20 Fed. Sent. R. 167, 169, 2008 WL 2201039, at *4 (Feb. 2008).

Finally, the problem that the guidelines pose in Mr. Romandetti's case is that they, with their unwarranted facade of certainty, cannot account for the unique factors of his case which support his requested variance.

**5.      The Need to Avoid Unwarranted Sentence Disparities among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct.**

Regarding the goal of avoiding disparity in the sentences of defendants, this factor strongly supports Mr. Romandetti's request for variance. To support this tenet, exhibit 5 provides charts of fraud cases nationally, many of which involved losses far greater than the alleged loss in this case.

In *United States v. Parris*, 573 F. Supp. 2d 744 (E.D.N.Y. 2008), Judge Block took a similar collection of cases into account in imposing an appropriate sentence for two securities fraud offenders. In response to the court's request, the parties submitted cases to illustrate the sentences imposed in other securities fraud cases. *Id*. at 752. Based on these samples, the court concluded that "[t]hose [defendants] who were not cooperators and were responsible for enormous losses were sentenced to double-digit terms of imprisonment (in years); [while] those whose losses were less than $100 million were generally sentenced to single-digit terms." *Id.* at 753. The court relied on this national pattern in arriving at a sentence of 60 months for the two defendants who faced an advisory guideline range of 360 months to life. *Id.* at 745.

In light of these cases, as well as the national statistics demonstrating consistent and substantial variances in fraud cases, Mr. Romandetti submits that a variance in his case is appropriate in order to avoid unwarranted sentence disparities.

**7.      The Need to Provide Restitution to Any Victims of the Offense.**

If Mr. Romandetti is incarcerated, his ability to pay restitution will be severely impacted. Conversely, a non-prison sentence will allow Mr. Romandetti to make restitution. *See* 18 U.S.C. §3553(a)(7)(cataloging "the need to provide restitution to any victims of the offense" as one factor to considering formulating sentence). Thus, this § 3553 factor supports the imposition of a probationary sentence with house arrest. *See United States v. Rangel*, 697 F.3d 795, 803-04 (9th Cir. 2012)("the district court's goal of obtaining restitution for the victims of Defendant's offense, 18 U.S.C. § 3553(a)(7), is better served by a non-incarcerated and employed defendant")(citation omitted).

## <u>CONCLUSION</u>

As the foregoing establishes, the unique circumstances presented in Mr. Romandetti's case warrant a variance below the applicable guideline range to a non-imprisonment sentence with a special condition of home confinement. The alternative, an advisory guideline sentence would not only be antagonistic to § 3553)(a), but also would violate the admonition in *Koon* that any sentencing must consider the individual defendant and the unique circumstances that mitigate his crime and punishment.

*/s/ Fritz Scheller*
Fritz Scheller

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel in this case on January 5, 2023.

/s/ Fritz Scheller
Fritz Scheller
Florida Bar Number 183113
Fritz Scheller, P.L.
200 East Robinson, Suite 1150
Orlando, Florida 32801
Telephone 407-792-1285
Facsimile 407-649-1657
Email: fscheller@flusalaw.com